UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KERRY JOHN DeGRAND,

       Plaintiff,

v.                                                  Case No. 13-C-1326

CAROLYN W. COLVIN,

       Defendant.

## DECISION AND ORDER

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Kerry DeGrand's application for disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge (ALJ) erred by failing to properly analyze and identify severe mental impairments, failing to develop a full and fair record, failing to account for all impairments in assessing residual functional capacity (RFC) and improperly discounting Plaintiff's credibility. For the reasons below, the decision of the Commissioner will be affirmed.

## BACKGROUND

**A. Medical Record**

Plaintiff was injured in 1995 while working as a welder for Bay Shipbuilding Company. Plaintiff fell 12–15 feet and landed on his back and shoulder area. Plaintiff underwent surgery on his shoulder and treated with physical therapy. He was seen several times Dr. Timothy Mjos, an orthopedic surgeon, although not the one that performed Plaintiff's surgery. Plaintiff complained

to Dr. Mjos of shoulder pain that would radiate to Plaintiff's head causing headaches. (Tr. 399.) In the follow-up, Plaintiff complained of the same symptoms, including headaches. (Tr. 401.) Plaintiff returned to work in a light duty capacity. In May 1996, Plaintiff saw Dr. Mjos again and complained of "pain, weakness and general unhappiness with his work due to the pain, etc." (Tr. 403.)

Plaintiff saw a number of other medical professionals during his recovery from shoulder surgery, including a neurologist, chiropractor, and occupational therapist. Plaintiff's primary care physician reviewed Plaintiff's medical records and noted three persistent diagnoses: supraspinatus nerve entrapment, impingement syndrome and capsular tightness. (Tr. 418–19.) In April 1996, the surgeon that operated on Plaintiff's shoulder opined that Plaintiff had reached maximum medical healing and would require limitations on his endurance for repetitive motions in front of his body. (Tr. 454.) The surgeon also opined that Plaintiff did not have the ability to perform overhead welding work. Plaintiff had been a welder for the past 20 years.

In addition to shoulder, neck, back and headache issues, Plaintiff experienced some memory problems after his injury. Before returning to work in February 1996, Plaintiff saw a psychologist, Dr. Gordon Helgeson, who performed cognitive testing and concluded that Plaintiff's "attention span and memory seemed okay and did not reflect his claim of poor attention and memory." (Tr. 389–90.) Dr. Helgeson also found "[o]ne of [Plaintiff's] strengths on the Wechsler Scales was his persistence to face a task and to work at them as best he could." (Tr. 390.) However, Dr. Helgeson also noted that Plaintiff was "very depressed at this time and that depression seems to hurt his critical

2

thinking at times and adds to his anxiety." (Tr. 391.) But Dr. Helgeson did not list depression as a final impression. Instead, he listed "adjustment reaction with mixed emotions" as his Axis I diagnosis and "mixed personality disorder" for Axis II. (Tr. 393.)

More than a decade later, on January 20, 2010, Plaintiff filed an application for disability. In the section requesting a list of "all of the physical or mental conditions (including emotional or learning problems) that limit your ability to work," Plaintiff listed "R arm and shoulder and left side head pain." (Tr. 256.) He alleged an onset date of October 6, 2007, but that would later be amended to July 20, 2008. (Tr. 104.) According to Plaintiff's work history report, after his injury in 1996 he was employed as a gas station clerk from 1996 to 1999, he worked as a welder from 1999 to October 2007, and he worked as a farm hand on a dairy farm from September 2008 to March 2009. (Tr. 276.) According to his function report, Plaintiff's daily activities around 2010 included caring for his dog, cleaning the house a little, preparing meals and some gardening. (Tr. 284.)

In March 2010, Plaintiff told family medicine physician Dr. Thomas Leonard that his shoulder pain was "tolerable," unless he used his right shoulder excessively, in which case the pain was a seven out of ten. (Tr. 247.) Plaintiff also told Dr. Leonard the pain would spread from his shoulder to the back of his head. (*Id.*) Plaintiff told Leonard he could lift 50 pounds.

On April 1, 2010, Plaintiff's application for benefits was initially denied. The report of a state agency physician dated the same day shows the physician's conclusion that he could do medium work. The physician did note: "The [claimant's] statements about his symptoms and their functional effects are fully credible." (Tr. 359.) On June 23, 2010, a second state agency physician reviewed

Plaintiff's records and affirmed the first physician's April 1 report as written. (Tr. 363.) On June 24, 2010, Plaintiff's application was denied on reconsideration. Plaintiff filed a request for a hearing before an ALJ on August 16, 2010.

On October 27, 2011, a year and nine months after he first applied for disability, Plaintiff complained of worsening memory to his primary care physician, Dr. Julie Bonnin. (Tr. 537.) As an example of his memory problems, Plaintiff told Dr. Bonnin he forgot whether he looked both ways while driving through an intersection. Plaintiff also told Dr. Bonnin he thought he had been depressed for the past six to eight years. Based on his report, Dr. Bonnin listed depression and situational memory loss as diagnoses, prescribed Citalopram (for depression and joint aches and pains), ordered a brain MRI and scheduled a follow-up in one-to-four weeks for a memory loss recheck. In the follow-up, Plaintiff complained that he continued to have memory problems and pain in his upper back, shoulders and neck, sometimes shooting into his head for days on end. (Tr. 570.) Dr. Bonnin told Plaintiff the brain MRI was negative, but Plaintiff requested they continue to investigate why his memory loss is so great. Dr. Bonnin diagnosed chronic neck, shoulder and upper back pain; referred Plaintiff to a neuropsychiatrist for his memory loss (because she was "not sure if he has depression or is simply distracted by chronic pain or if it is truly a dementia" (Tr. 571)), and referred him to a chronic pain management specialist for the pain.

Plaintiff saw the pain management specialist, Dr. Ahmet Dervish, on November 15, 2011. Dr. Dervish noted: "The number 1 area of pain is the neck pain with occipital radiation with headaches." (Tr. 549.) Plaintiff told Dervish his headaches only come on from time to time, but when they do, they are debilitating. Plaintiff told Dervish he only took over-the-counter anti-inflammatories. Dr. Dervish assessed Plaintiff's headaches, noting that while the etiology is unclear,

4

the headaches were "most likely cervicogenic headache with possibly some migraine type characteristics when he does have the headaches." (Tr. 551.) With respect to Plaintiff's shoulder, Dervish concluded Plaintiff had bilateral shoulder pain from the surgery, as well as intrinsic shoulder problems, most likely osteoarthritis. (Tr. 551.) Dervish also noted Plaintiff had depression. Dervish prescribed Gabapentin for better sleep and pain control and ordered an MRI of the cervical spine.

On February 7, 2012, Plaintiff returned to Dr. Dervish for a follow-up. Plaintiff reported that his neck and head pain had improved dramatically. (Tr. 545.) Plaintiff reported that his worst pain at the time was in the lower back and leg. Dr. Dervish ordered an MRI of the lumbar spine, provided another prescription for Gabapentin and instructed Plaintiff to call when the results of the lumbar MRI were in.

Dr. Dervish saw Plaintiff again on July 10, 2012. Recounting his history with Plaintiff, Dr. Dervish noted:

> The patient is a 58-year-old man who I saw for the first time on 11/15/11 and then in February of this year. The patient came to me initially with neck pain, back pain, thoracic area pain, and headaches. The second visit was for the left-sided low back pain and low back pain. At that time, the patient was found to have some protrusion at the L3-4 levels. I did offer him an injection, but he never really followed through on that and now feels that that is okay, the back and leg pain are very okay.

(Tr. 564.) Dr. Dervish then noted "today he is mainly here because of the fact that he is applying for disability and he would like to obtain supporting documentation." (*Id.*)

On exam, Dr. Dervish noted Plaintiff's pain assessment was 5 to 6/10 (though he took only an occasional aspirin for pain). Plaintiff had normal range of motion in the cervical spine, was neurologically intact in the upper extremities, but had limited range of motion in the right shoulder, including flexion and extension and internal and external rotation with some pain at the end ranges

5

of motion. His mood and affect were appropriate. (*Id.*) Lumbar and cervical MRIs were "pretty age-appropriate." (Tr. 565.) Dr. Dervish's assessment reads:

> This is a 58-year-old man with generalized pain complaints including neck pain, tailbone area pain, low back pain, bilateral shoulder pain, widespread pain, unclear exact etiology. The patient does have mild degenerative changes in the cervical and lumbar spines. I think that more concrete area of pain will be the right shoulder with limited ranges of motion and prior surgery.

(*Id.*) As for Plaintiff's disability application, Dr. Dervish thought the most likely area that would affect his ability to work would be the right shoulder, but declined to offer any opinion of his own, suggesting instead that Plaintiff see a shoulder specialist or an occupational medicine physician. (*Id.*)[1]

The neuropsychologist Dr. Bonnin referred Plaintiff to, Julie Bobholz, Ph.D., conducted a multi-day evaluation of Plaintiff in January and February 2012. Plaintiff complained to Dr. Bobholz about his neck, shoulder and head pain, as well as his progressively worsening cognition, including memory problems and slowed processing. Dr. Bobholz assessed Plaintiff and concluded that "cognitive testing revealed relative deficits on tasks of sustained attention and learning/memory. Otherwise, most performances were considered within normal results." (Tr. 541.) Dr. Bobholz wrote that "given his deficits on exam, there would be concern that he would be at risk for errors/mistakes in his work, as well as forgetfulness." (*Id.*) Bobholz noted that Plaintiff complained of headaches that were typically dull but at times intense, but Plaintiff stated he did not take medication for his pain. Dr. Bobholz concluded her report by noting: "It became apparent during

---

[1] According to Plaintiff, Dr. Dervish did complete a form assessing Plaintiff's RFC. (Pl.'s Mem. 19 n.5, ECF No. 17.) The form states that the patient could never perform work above the shoulder level (Tr. 566), which Plaintiff argues is inconsistent with the ALJ's RFC finding. The ALJ did not give the form any weight, though, because it was not signed, did not have Plaintiff's name on it and was inconsistent with his report stating he had no opinion. (*See* Tr. 70–72, 111.)

6

feedback that Mr. DeGrand has been unable to afford much for care and as a result has been unable to get the medication prescribed. We called the VA when he was in clinic and found out that he can get his medications covered if he has his provider fill out a form and fax it to Milwaukee for processing. With this method, he should be able to get necessary medications and hopefully begin to have better relief from his symptoms of mood disturbance, sleep disturbance and pain." (*Id.*)

Plaintiff returned to his primary care physician, Dr. Bonnin, in June and July 2012, shortly before his hearing. In June, Dr. Bonnin noted Plaintiff "feels that he is depressed and he is seeking treatment at this time." (Tr. 572.) He told her that he thought he had struggled with depression for years, but had never taken treatment for it before. Plaintiff then took a PHQ-9 questionnaire and scored a 21 out of 28, which according to Dr. Bonnin, indicated severe depression. (*Id.*) Dr. Bonnin prescribed Citalopram. In the follow-up in July, Plaintiff noted he was sleeping better, but complained of continued fatigue and depression. (Tr. 574.) Dr. Bonnin diagnosed chronic depression and switched the prescription to Wellbutrin. She also stated she intended to have Plaintiff see a counselor if the new depression medication did not work, based on her concern that his depression was medication resistant. (Tr. 575.) A form submitted by Plaintiff right before the hearing indicated he had seen yet another physician, Dr. John Riser, in August 2012 and that he was taking Viibryd for major depression. Plaintiff stated the new medication was not working for relief from depression or with his sleeping or pain issues, but the medicine caused diarrhea and was making him hear and see things. (Tr. 580–81.)

### B. Hearing and ALJ Decision

On September 6, 2012, Plaintiff and a vocational expert testified at a video hearing before an ALJ. Just before Plaintiff was sworn in to testify, the ALJ ruled that he would not allow

7

testimony from a witness who had given Plaintiff a ride to the hearing. The witness was a friend and neighbor of the Plaintiff. Plaintiff's counsel explained the perceived need for the witness's testimony:

> The proposed witness . . . has been present when [Plaintiff] suffers seizure-like episodes where he has sudden pain in his head and is unaware of what's going on around him and has to stop what he's doing. [Plaintiff] is also there, but he can't really testify about it.

(Tr. 36.) The ALJ then asked Plaintiff's counsel if Plaintiff sought medical attention after the episode the witness observed, counsel replied in the negative, and because of that fact, time limitations due to other hearings, as well as the fact that the ALJ did not know about the witness until the hearing was underway, the ALJ did not permit the witness to testify. (Tr. 36–37.) The ALJ did, however, expressly permit an affidavit from the witness to be filed and made a part of the record (Tr. 37), but no such affidavit was filed.

Once Plaintiff was sworn in, he testified at length regarding his work history. Plaintiff testified that his work since his amended onset date of July 20, 2008 included: one year of work as a "go-fer" at a tractor repair shop starting around September 2010, in which he worked a maximum of three days a week doing things like greasing and changing oil (Tr. 44); two days measuring windows since being laid off in September 2011 (Tr. 42); and constant self-employment fixing lawnmowers out of his house since being laid off in September 2011 (Tr. 47). Plaintiff testified that he spent about three hours a day fixing lawn mowers, and three to five hours a night looking up schematics for engine parts on the Internet. (Tr. 60.) He also testified he files taxes and keeps some basic records in connection with his lawn mower repair business. (Tr. 92–93.) Plaintiff also described his work history going back fifteen years, including work as a welder and as a gas station clerk.

Plaintiff complained about headaches three separate times during the hearing. First, he said, when talking about stocking shelves as a gas station clerk, "if it's really busy with my arm outstretched like that, it's just going to cause shoulder pain, which results in my head pains." (Tr. 54.) Second, when the ALJ asked if there was anything Plaintiff wanted to add that they had not talked about, Plaintiff said "Just that these pains that I have in my head. I've had these ever since I fell, and I just got over four days of them. It's just can't sleep. They're debilitating, Your Honor. I can't sleep. I can't do hardly anything. The only thing that actually stops the pain is if I just sit there on the couch and I don't move around." (Tr. 73.) Finally, Plaintiff began to describe his recent bout with head pains again during questioning from his representative, but the ALJ cut off further testimony after Plaintiff admitted he did not seek medical attention during the headache. (Tr. 84–85.)

Though Plaintiff testified that his main issue was shoulder pain, he also complained about his depression during the hearing. On questioning from the ALJ about his treatment of depression, Plaintiff testified that he was not currently in therapy and that he had not sought care for his depression until 2012. (Tr. 64–67.) Plaintiff stated that none of the medication his doctors had prescribed in June, July and August had worked and the ALJ noted that medications take a while to get absorbed into the system. (Tr. 65–66.) On questioning from the ALJ, Plaintiff then testified that he had not been to the emergency room and had not been an inpatient in a mental health facility since 2008. (Tr. 68.)

A vocational expert also testified at the hearing. When the ALJ posed a hypothetical question based on Plaintiff's education and age that was limited to lifting no more than 25 pounds frequently, 50 pounds occasionally and the ability to perform overhead tasks no more than

9

occasionally, the expert determined that the hypothetical person would not be able to perform the responsibilities as a welder because of the overhead tasks required. (Tr. 90.) The expert determined that the hypothetical person could perform the work of a clerk at a self-service gas station, but if the person were unable to maintain the attention or the concentration necessary to perform detailed or complex tasks, he could not perform the gas station job. (Tr. 92–93.)

The ALJ issued his decision on September 12, 2012, finding the Plaintiff was not under a disability as defined under the Social Security Act. Under the first step of the sequential evaluation process, the ALJ found Plaintiff was not engaged in substantial gainful activity since July 20, 2008. (Tr. 106.) Under the second step, the ALJ found the Plaintiff had two severe impairments: status post right shoulder injury and surgery and degenerative disc disease. (*Id.*) The ALJ found Plaintiff's depression was medically determinable, but was not severe. (Tr. 107–08.) The ALJ dismissed Plaintiff's headaches, along with a number of other alleged ailments, including a broken sternum, carpal tunnel syndrome, carbon monoxide poisoning and knee and elbow pain, as non-medically determinable. (Tr. 108.) Under the third step, the ALJ found Plaintiff's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Next, the ALJ found the Plaintiff's had the RFC to perform light work, as defined in 20 C.F.R. 404.1567(b), except with no more than occasional overhead reaching/work. (Tr. 109.) Finally, under the fourth step, the ALJ found Plaintiff was capable of performing his past relevant work as a gas station clerk/cashier. (Tr. 112.) Accordingly, the ALJ found Plaintiff was not under a disability from July 20, 2008 to the time of the decision.

The Appeals Council declined review on October 9, 2013, causing the decision of the ALJ to constitute the final decision of the Commissioner of Social Security under 20 C.F.R. § 404.981. Plaintiff timely filed this action for judicial review under 42 U.S.C. § 405(g) on November 25, 2013.

**STANDARD OF REVIEW**

The Commissioner's final decision will be reversed only if it is not supported by substantial evidence or is based on a legal error. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007). A reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner*, 478 F.3d at 841. But if the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**ANALYSIS**

**I. Step Two**

**A. Depression**

Plaintiff argues the ALJ erred at step two in finding Plaintiff's depression was not a severe impairment. An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

In finding Plaintiff's depression was not a severe impairment, the ALJ wrote:

> The record documents that the claimant only sought minimal care for his depression and there is no evidence of him needing ongoing therapy, counseling, inpatient care, or emergency care for his symptoms. At the hearing, the claimant confirmed that he does not receive ongoing therapy for his symptoms, suggesting they are not as limiting as alleged.

(Tr. 107) (citations and footnote omitted). The ALJ also noted in a footnote: "Notably, although the treatment records document the claimant having 'severe depression,' that finding was based upon the claimant's own subjective answers to a questionnaire and not based upon objective mental status examinations." (Tr. 107 n.1.)

Plaintiff contests the ALJ's statements that he only sought minimal care and that there was no evidence of him needing ongoing therapy. He complains that the ALJ did not elaborate on what degree or type of treatment would be sufficiently convincing, and notes that although he did not receive treatment until 2011, he was noted to be "very depressed" as early as January 16, 1996, by Dr. Helgeson. Plaintiff points out that Dr. Bonnin began following his depression in October 2011, and prescribed Citalopram in June 2012. Seeing no improvement, she switched him to Wellbutrin in July and suspected that he may have medication resistance. She intended to refer him to a psychiatrist if there was no improvement. This, Plaintiff suggests, constitutes ongoing treatment, and to the extent he did not seek treatment earlier, Plaintiff argues that the ALJ failed to inquire into potential reasons as required by SSR 96-7p.[2]

---

[2] SSR 96-7p states in part: "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, *7 (July 2, 1996).

12

But Plaintiff testified at the hearing that he first sought treatment for depression in 2012, notwithstanding an alleged onset date of July 20, 2008. Though Dr. Helgeson stated Plaintiff seemed severely depressed when he was undergoing rehabilitation for his shoulder injury in 1996, no further mention is made of depression for some fifteen years. Dr. Bonnin, his primary care physician, noted it wasn't until June 8, 2012, only three months before the hearing, that Plaintiff decided to seek treatment for depression, which appears to have been diagnosed, at least in part, based on Plaintiff's answers to a questionnaire. (Tr. 572.) And after starting him on Citalopram in June, she had only recently switched him to Wellbutrin in July, and he then saw a third physician in August who switched him again. Three doctors' visits in the three-month period leading up to one's disability hearing more than four years after the alleged onset date is hardly ongoing treatment. At least, I cannot say it was error for the ALJ to regard it as something less.

Nor did the ALJ err in failing to inquire into possible reasons why Plaintiff had not sought treatment earlier. The ALJ did not find simply that there was no evidence that Plaintiff sought treatment earlier; he found that there was no evidence Plaintiff had been in need of ongoing therapy, counseling, or other care. (Tr. 107.) The issue of depression never even surfaced until well after Plaintiff's alleged onset date. If no need for treatment is shown, the ALJ does not err in failing to inquire into other reasons why it might not have been sought.

More importantly, the ALJ carefully considered the four broad functional areas known as the "paragraph B" criteria and concluded based on the Plaintiff's description of his daily activities that he had no more than mild limitations in activities of daily living, social functioning and concentration, persistence or pace. Plaintiff testified that he was capable of caring for pets, managing his own personal care, preparing meals, washing laundry, sweeping, mopping, cutting the

13

lawn, gardening, going outside daily, driving, shopping, using the computer, managing money, operating a small engine repair business, riding a motorcycle, reading and watching television. As to social functioning, the ALJ noted that he spent time with others, and there was no evidence that he did not get along with family, friends, neighbors, customers, and co-workers. (Tr. 107.) This evidence showed no more than mild limitations in social functioning. As to the areas of concentration, persistence or pace, the ALJ cited the findings from the multi-day neuropsychological evaluation that there were some relative deficits on tasks of sustained attention and learning and memory. The ALJ also noted, however, that the record showed Plaintiff engaged in "numerous activities of daily living that require a significant amount of concentration, persistence and pace, such as running his own business, driving, performing household chores, managing money, and using the internet." (Tr. 108.) Based on these activities, the ALJ concluded that Plaintiff's "relative deficits in sustained attention, learning, and memory do not appear to cause more than mild limitations." (*Id.*) Added to these findings, the fact that Plaintiff had no episodes of decomposition, warranted the ALJ's conclusion under 20 C.F.R. § 404.1520a(d)(1) that Plaintiff's mental impairment was not severe.

Plaintiff argues that the ALJ erred in failing to assess the severity of the relative cognitive deficits noted in the neuropsychological evaluation separately. He contends that with regard to the area of concentration, persistence, and pace, the evidence from Dr. Bobholz's series of cognitive tests contradicts the ALJ's findings. Dr. Bobholz's test, Plaintiff contends, suggests that Plaintiff will have difficulty with memory and committing errors at work. Expert guidance was needed, Plaintiff contends, in order for the ALJ to reach the conclusion that these limitations were not severe.

Plaintiff is mistaken. An ALJ is not required to accept an opinion just because it is offered by a person with the initials "M.D." or "Phd." after his or her name. The Seventh Circuit has made clear that a medical expert's opinion of what a claimant has the capacity to do does not control over actual evidence of what the claimant does:

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a). That is, the SSA need not accept only physicians' opinions.

*Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *Murphy v. Astrue*, 454 Fed.Appx. 514, 517–18 (7th Cir. 2012) (holding ALJ did not err in rejecting expert's limitation in social functioning based on claimant's employment history and testimony that she did not have a problem getting along with people) (unpublished). Similarly here, it is clear the ALJ rejected Dr. Bobholz's opinion to the extent, if at all, it suggested that Plaintiff's mental impairment was severe.

In sum, Plaintiff disagrees with the ALJ's analysis, to be sure. But this provides no basis for the court to overturn it. The role of assessing the weight of the evidence is the Commissioner's, not the court's. Here, the ALJ explained his reasons and constructed a logical bridge from the evidence to his finding that Plaintiff did not have a severe mental impairment. Based on the record before me, his finding must stand.

### B. Headaches

Plaintiff also argues that the ALJ erred in finding that his headaches were not medically determinable and in refusing to allow his witness to testify at the hearing concerning the extent of his pain. "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20

15

C.F.R. § 404.1508. Here, the ALJ concluded that several of Plaintiff's complaints, including his complaint of severe headache, were not medically determinable and thus could not be considered. Plaintiff argues that the ALJ clearly erred in so finding because the medical record is replete with indications that Plaintiff has complained of head pain in connection with his right shoulder and degenerative disc disease.

A careful reading of the ALJ's decision, however, reveals that while he rejected headaches as a medically determinable impairment by itself, he did consider Plaintiff's claim that he suffered from headaches as a symptom of the medically determinable impairments that were found. In other words, there was no evidence of migraine or other kinds of headaches that were not related to the medically determinable impairments of shoulder injury and degenerative disc disease. Thus, to the extent it was error to reject Plaintiff's complaint of headaches as a physical impairment, the error was harmless because the ALJ gave full consideration to Plaintiff's evidence of head pain as a symptom of his medically determinable physical impairments. For example, the ALJ noted that Plaintiff had complaints of neck pain and headaches, as well as low back pain that radiated into his left lower extremity. (Tr. 109.) Citing Dr. Dervish's June 12, 2012 report, the ALJ also noted that Plaintiff stated that his neck pain and headaches improved dramatically. (Tr. 110.) Based on this and other evidence cited in his decision, the ALJ concluded that Plaintiff's complaints of disabling headache and other pain were not credible. (*Id.*)

Plaintiff also claims that the ALJ improperly barred testimony from his neighbor about his experience of head pain. Plaintiff claimed that the pain was so severe and of such a nature that he could not describe it himself. But the ALJ did not prevent Plaintiff from offering such evidence. He gave him the option of supplementing the record with a statement from the witness. Plaintiff chose

not to do so. The ALJ has the right to preside over the hearing so as to insure a fair and complete record in as efficient and expeditious a way possible. Plaintiff cites no authority suggesting that an ALJ may not direct a party to supplement the record by witness affidavit in order to complete the hearing within the scheduled time. In addition, it should be noted that Plaintiff was able to testify three times at the hearing about his head pain and the record as a whole contains ample documentary evidence of Plaintiff's complaints of head pain. For all of these reasons, I conclude that the ALJ did not err in his consideration of Plaintiff's headache complaint.

**II. RFC**

Plaintiff argues that even if the ALJ did not err in finding that his mental impairment was not severe, he still erred in failing to account for the limitations and restrictions imposed by it upon his RFC. In support of this argument, Plaintiff notes that the RFC is an assessment of the maximum work-related activities a claimant can perform despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The assessment "must be . . . based on all the relevant evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (§ 404.1545(a)(1)). The ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, *5 (July 2, 1996). Because the ALJ failed to consider the restrictions from his non-severe impairments in formulating his RFC, Plaintiff contends that a remand is necessary.

I agree with the Commissioner that this argument seems little more than a repeat of Plaintiff's argument that the ALJ erred in failing to find his mental impairments severe. The ALJ explained that in making his finding concerning Plaintiff's RFC, he had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence

17

and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 97-7p." (Tr. 109.) The ALJ also stated that he was considering the "combination of the claimant's severe and nonsevere impairments" in arriving at his determination. (Tr. 110.) The plain fact is that he found Plaintiff's mental impairment imposed "no more than mild limitations" in any functional area and found no need to include any nonexertional limitations in his RFC. Plaintiff presents no persuasive argument that the ALJ's RFC finding was not supported by substantial evidence.

**III. Credibility**

Finally, Plaintiff also raises two challenges to the ALJ's credibility determination. In the course of determining Plaintiff's RFC, the ALJ, as he is required to do under the sequential evaluation process, first considered whether Plaintiff's underlying medically determinable impairments could reasonably be expected to produce the claimant's pain or other symptoms. The ALJ acknowledged Plaintiff's many symptoms, including an impaired ability to lift, bend, reach, remember, complete tasks, as well as his shoulder problems, head pains and depression. (Tr. 109.) Next, the ALJ was required to consider the intensity, persistence and limiting effects of the symptoms reasonably caused by the impairments, and to the extent the symptoms are not substantiated by objective medical evidence, the ALJ is required to make a credibility determination. He did so in this case because he found "[t]he record fails to fully substantiate the claimant's allegations of disabling symptoms." (Tr. 110.)

First, Plaintiff argues the ALJ focused only on selected medical records and did not consider all of Plaintiff's treatment and records or the regulatory factors. *See* SSR 96-7p, 1996 WL 374186, *3 (July 2, 1986) (listing seven factors). But there is no requirement that the ALJ discuss every piece of evidence or provide a separate analysis for each factor. With credibility, the question is

18

whether the ALJ's assessment is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir. 2004). Here, the ALJ cited to SSR 96-7p and discussed relevant evidence, including test results, treating providers' descriptions of Plaintiff's impairments as mild or moderate, Plaintiff's recent statements to treating providers that his pain was "very okay," dramatically improved and "tolerable," the type of medication Plaintiff treated with, as well as detailed findings about Plaintiff's daily activities. These are specific reasons that are supported by the record. Thus, the ALJ complied with SSR 96-7p. *See id.* at 505.

Second, Plaintiff argues the ALJ erred in summarily dismissing Plaintiff's credibility with a "tautology"—that is, he improperly found Plaintiff's allegations conflicted with what the ALJ had just decided were the Plaintiff's limitations. The ALJ wrote:

> [A]fter careful consideration of the evidence, the undersigned finds that although the claimant's medically determinable impairments could reasonably be expected to cause some of the symptoms of the types alleged, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 110.) As the government points out, this might be impermissible standing alone. But the ALJ proceeded to discuss the specific reasons he reached that conclusion, so the use of this standard RFC language is not problematic. *See Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony."). Accordingly, for all of these reasons, there is no basis to overturn the ALJ's credibility determination.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.


**SO ORDERED** this 18th day of November, 2014.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court